Here is the final case on the calendar, Nobile v. Watts at DreamWorks. Daniel J. Brooks for appellant Joseph Nobile. May it please the court. The complaint should not have been dismissed because a reasonable jury could find that the defendant's novel and film were substantially similar to Mr. Nobile's screenplay. Specifically, a reasonable jury could find that both the novel and derivatively the film copied a more than de minimis amount of protected expression from the screenplay, thereby rendering the defendants liable for copyright infringement or potentially liable. You concede, and please correct me if I'm misunderstanding, this is taken from your brief on page 29, that a childless couple providentially finding a motherless baby in a boat washed up on an island and deciding to keep the baby is an unprotectable idea. Yes. Is that understandable? That's the abstract idea. So why couldn't we say that it's also an idea that a couple that has suffered three miscarriages or stillbirths find a baby washed ashore immediately following a recent stillbirth and decide to keep the baby, conceal its origins by claiming that it is stillborn? Aren't the situations somewhat different? Is it the same? You're getting now down several levels from the top abstract idea. I mean, you can do that with anything. You could say the movie Casablanca is about a cynical American expatriate who opened a saloon in Morocco right at the outset of World War II. But then if you start adding in, oh, and he had an African-American piano player who played a certain song better than anyone else, but he had been told by the boss not to play it anymore because it brought back bad memories of a failed romance. And then of all the gin joints in the world, she walks in with her husband. Yeah, so you can say that's all an idea, but I think at a certain point, it's very hard, but you have to draw the distinction between the idea and the expression of the idea. Where do you draw it here? I mean, frankly, I'd rather, I prefer the other movie, let's put it that way. But how do we, I mean, we have words. Where do we draw it? Because there are a tremendous number of, a lot of difference. I think somebody wisely called it the light between the oceans because the work that you're representing is not about a lighthouse or a light between oceans. So the question is whether there's copying of protected expression and whether, as the district court appears to have found, although the district court opinion doesn't discuss the overwhelming majority of the similarities, apparently the district judges, certainly the defendants have argued very articulately that all of these similarities are, are not random or they're cherry picked or they're center fair. In other words, a center fair is a sequence of events that necessarily result from the choice of a setting or situation. So you have to first decide what's the setting or situation. You can't go into too much detail because then anything could be copied. So I say, first of all, let's start with the situation. It's a childless couple who are desperate for a baby and a baby washes up in a boat. Now, as we tried to explain in the brief, there could be many reasons why a couple could be childless. It wouldn't necessarily, it's not necessary that there have been failed pregnancies, stillbirths or miscarriages. It could be, I didn't put this in the brief, it could be a same sex couple in today's world. It could be a couple where one of the partners is infertile. So the, the idea that of course there's going to be a miscarriage, a stillbirth scene with a trail of blood and the woman saying, let me hold my baby, that's a center fair. Well, not necessarily, but let's say it is Judge Kasten. Let's bring it down a little bit more so that the, the unprotectable idea is a childless couple who've had, who First of all, they've had three failed pregnancies. And also there are three graves for these three pregnancies. Um, counsel for the novel defendants said that there's only one grave in the, um, in the, in the novel because the first two were miscarriages. The third was a, um, uh, stillbirth. That's not true. Uh, if you look at page a page 113 of the appendix, which is in the first volume, the, the novel of page 85, uh, she goes and sits by the graves, plural. So there are three graves, there are three crosses. That's not disputed. That's not something that follows necessarily from the idea that we're positing. Next, the last stillbirth, there is a trail of blood and the woman is saying, let me hold my baby. Um, the woman is praying in both works. The woman is praying by the crosses. They say, oh, she's praying for completely different things in the novel. She's reciting a couple of parts of the Lord's prayer. If you look at, so you, you, you cite to 18, I'm sorry, you note 18 similarities. Yeah. Well, actually I left out the 19th, which is a big one that they send the boat back into the sea. I overlooked it. I apologize. You need a certain number in order to, no, I don't think so. I don't think there's any magic number or any, a magic amount of taking. You were on a panel in the Nihon case where they're Japanese translations and the opinion says, um, I think you were, or maybe judge sacks was says that there's no magic dividing line. 20% 30% is it's the question is, was protected expression taken in a more than de minimis, um, amount. And, and by the way, in, in cases that we all cite, we cite, they cite the judge site sites, Williams V Crichton, the Jurassic park case. This court said it is only when the similarities between the protected elements are of small imports quantitatively or qualitatively that the defendant will be found innocent of infringement. That's a page five 88. In the same case that this court said at page five 90 only when similarities are insubstantial or unprotectable, will the claim fail? One of the things that I find trolling about the argument is it seems to me, and of course one would have to go and, and look at it rather careful. Uh, it's a lot of reading and watching to do, but it seems to me that the, that the, uh, book and the screenplay that follows, uh, uses the vehicle to address a very modern and, uh, um, not unusual situation, which has to do with the tension between, uh, a, a, the biological mother and the adoptive mother basically. Whereas that, and that seems to kind of, you know, based on my limited reading. Whereas the other one is almost like a parable about, about, uh, a, a, uh, a very pious woman and her, uh, impious, uh, husband and, and, and what, what, what they're, what they are, are after, what they're talking about using the same crosses and the same are different things. Uh, my client's protected expression was taken at least as a jumping off point for this book. Without what they took from my client's screenplay, there would be no novel. You've got to have that as the built basic building block. It's not a small import. It's almost the most important part of my client's screenplay was, was taken and it's without it, there would be no novel. Let me explain the other conflict that's common to both. It's a conflict between morality. I'm finished, please. It's a conflict between morality and selfishness. Here are these people, they've suffered. Here comes providentially, a baby comes. They, there's a conflict between the man and the woman. It's identical in the two works. The dialogue is identical, contrary to what they say. So that, and that's not necessary. A baby could wash up and both the husband and wife could say great. Dialogue, dialogue. Yes. And let me, let me give you, I'm going to give you word for word. The baby washes up, they bury the, in both works, they bury the dead adult, the mother in the screenplay, the father, it turns out to be the father in the novel. This is not mentioned in the district court opinion, by the way. They take the boat, they get rid of the boat. The husband, no, I'm sorry. The wife in the screenplay, the pious woman, she says, we don't know who this dead woman is, but the baby must have a father somewhere. That's a screenplay. In the novel, the husband, who's the reluctant partner, says, we don't know who this man is. There must, the baby must have a mother somewhere on the mainland in Australia waiting for it. The husband in the screenplay to overcome this reluctance says, this is no accident. This was meant for us. It was destined for us, which seems to work. In the novel, the wife says, this can't just be a coincidence. We should, um, accept this gift that's been sent to us. And then she also says, and we haven't, how long have we been hoping for, praying for a baby? So I think, and by the way, in the footnote six. Even if we accept all that, I understand that, um, going back to what Judge Sack was saying, the two treatments have a different, uh, uh, sensibility about them. One is, is kind of a, uh, a meditation about, uh, choices to be made. Uh, and the other is, is more of an action packed, uh, account. Um, so even though there are these similarities that you suggest, if you step back and look at the, uh, the, the treatments, there are great differences between the two, one might argue. Partly because there are two different genres, but let me, let me read to you what this court said in the Tufankia case, Tufankian at page 135. Total concept and feel, which I think is what you're alluding to, should not be viewed as a sine qua non for infringement. Similarity that is otherwise actionable cannot be rendered defensible simply because of a different concept and feel, which echoes what Judge Hand famously said many years ago in 1930, no plagiarist can excuse the wrong by pointing, by showing how much of his work he did not pirate. And that's what you've got here. They took enough. Of course, they added on other things. They added on flashbacks to world war one. They added on the real biological mother gets eventually gets the baby because when the, when the, when the unearthed, when the bodies are dug up that both of the husbands are suspected of murder by a constable. And this is in the early 20th century. And that's significant for a reason I just thought of. So that's why I didn't put it in the brief. There was no testing for DNA then. So in that time period, either in my client's screenplay or 20 years later, if it is 20 years later in the novel, a childless couple finding somebody else's baby could pass it off as their own. And there would be no scientific way of proving that that was not their biological baby. But there are other conclusions. I think the striking. And I think also when this is resolved and they decide to hold them and this is prefigure Oh, and she's lactating. I'm sorry. I forgot about that because she just had a stillbirth. That's not a center fair. That's not inevitable. So she can breastfeed the baby in both works. And this is prefigured with leaking milk and the husband's reactions. One is captivated to see it. The other is arrested to see it. And then they decide to keep the baby and it leads to foreboding and stress and vomiting, which is one of the few things the judge below actually pointed to as a similarity. Not the biggest one. It was assumed in the lower court by the parties and the judge that there was copying, that the similarities were sufficient to be probative of actual copying. So we're not here. We're not here to say, well, there's also Moses. There's also the Odysseus, the Odyssey. That's not the point. This was the premise of this motion of the dismissal of the case was that these things were copied by Ms. Watts in her first and only novel from my client. So the only question is, are they sufficient? Is it more than de minimis copying a protected expression? I've tried to explain how these things are not random. They're not scattershot pulled out to make a list. I know some of the cases, Williams, in fact, says these lists are suspect. But I mean, how else am I going to try to show you and the district court that there are similarities? You have to say what they are. And the judge was supposed to have read the briefs, the book, the screenplay, viewed the film, which was never provided to her, but there is Netflix. So maybe she saw it that way. And I know you're all stuck with having to do that now. I reserved two minutes. I know I'm way over, but if I can, I would like to talk then about the attorney's fee award. If that's possible. May it please the court, Elizabeth McNamara for the defendants, Ms. Steadman or Watts and Simon and Schuster. I think your honors pose the appropriate question here, and that is how do you draw the line? And this court has consistently drawn the line in copyright infringement actions involving narrative fiction by looking at the total concept and feel and evaluating the plot, the characters, the setting, the themes, the pace, and the like. And here, the plaintiff steadfastly seeks to avoid that test and argues, in fact, this court should reject it. What do you make of, there's the Tufankhian standard statement that says that the total concept and feel should not be viewed as the sine qua non for infringement. I think that's correct. I mean, I think that you have to look at, you do look at the whole, but what rest, what every single copyright infringement test rests on is two core principles. And here, the plaintiff's case runs afoul of each of them. The first is, and these core principles were recognized in your honors, Gato's decision. The first is the idea expression dichotomy. And the second is that the text themselves control, not the characterization of the test or the argument regarding what the test do or do not have. You look at the text itself. And it is the text of these respective works, when you look at them in their actual expression, not the ideas, that controls, that dictated the dismissal below, and we suggest dictates the affirmance here. Now, he made, I think, an important admission here, and again, you can go back to Gato to address it. He said this morning, my learned counsel, that what is similar here is merely a jumping off point, that that's what's similar. Well, as we know from Gato, and we know from many other cases, when you have a similar idea, and I'm happy to get into this providential arrival of a baby, and how, in fact, in expression, there is no similarity beyond the abstract idea. But when you have a similar idea in two respective works, that to argue that that would be protected, and that he owns that idea, and that someone else can't use that same jumping off point, would, in the words of Gato, contravene the underlying goal of copyright to encourage others to build freely upon the ideas and information conveyed by a work. So that alone, by his own admission, I think warrants the affirmance of this case. That wasn't the whole of counsel's argument. I mean, he also tried to point to any number of ways in which the story was developed, and I'm really summarizing now. I don't mean to capture all of counsel's argument, but the boat, the crosses, the statements of the parents, sometimes put in the other parent's mouth. But counsel did argue a number of specific ways in which the story was advanced. Do you want to tell us why you don't think that's enough to warrant relief for him? Yes, Your Honor, I'd be happy to. Really, at its heart, the plaintiff argues that both of these cases start with the same providential arrival of a baby in a boat, and that then the conflict over whether to keep that child or not, and there is breastfeeding that occurs, and there had been a prior stillbirth by, in the plaintiff's case, three stillbirths, and the other, there were two miscarriages. When you drill down, as the law requires, into how each of those events are expressed in the respective works, there is simply no similarity. Let's take the boat arriving. In the plaintiff's work... I want you to continue, but can we start out, as you continue, can we start out with the assumption, for purposes of argument, that up to this point, the things that you said, his 18 points, that they were actually copied, and there was a certain amount of possibility of access. For purposes of argument, can we start with the notion that they were all Correct, Your Honor. I mean, I think that we admit, for purposes of the motion solely, that there was access and there was probative copying. We do not admit that the expression of even his 18 points are similar, substantially similar, and so when you get, like, let's take the boat arriving. In the plaintiff's work, the husband is en route to pay a strongman in order to impregnate the strongman's daughter. His money flies out of his hand. He goes to the shore. We have a scene that is given a lot of detail about a woman who is in a breach birth that's violent, it's bloody. Ultimately, the woman dies. He helps birth this baby. He's alone on the beach. He takes the baby back to his wife. She accuses him of doing something wrong, of somehow impregnating someone, and then ultimately, they decide to keep this baby because it is, and they're going to tell people that their stillborn baby was brought back to life and it was a miracle. That's what happened. In that scene also, there is the breastfeeding, which they put a lot of weight on, but with the breastfeeding in the plaintiff's work, what happens is that the husband sees it and all of a sudden has a revelation. Ah-ha, we can keep this baby. Let's bury the woman and let's keep it, and we'll say it's a stillborn that came back to life and it's a miracle. Okay, that's the plaintiff's story. Let's look at the novel. In the novel, we have that there had been a stillborn, but then the husband and wife both independently hear a baby crying. They both go out. They go together to the shore. There's no violent stillbirth. There's a deceased man in a boat. It is a quiet, serene scene, except for they're hearing a baby cry. They ultimately determine that there is a baby girl who is three months old in the bow of the boat. They take that baby back to their house. They feed the baby with a bottle. It is only later that evening that the wife breastfeeds the baby, and it's important to note, because this is what expression is all about, this is the motivations that inform and distinguish works. There, the husband is arrested by seeing it. He is alarmed. He is bewildered because the husband recognizes that his wife is going to want to keep this baby, and he knows it is wrong. He knows that this is the novel. He also focuses on that both works involve a loss of a baby. Well, we could not have more dramatic differences between the loss of the baby that occurs in these respective works. In the plaintiff's work, he dies at four days old when they're climbing a cliff, and incredibly somehow a wind blows the baby out of his arms, and he tumbles down to the shore. In the novel, the baby is not a baby. It's four years old. It's lived a serious life with a parent, and the conflicts with the fact that there's a living mother, biological mother, who's yearning for her child. Ultimately, the four-year-old child is returned to the biological mother. There is simply no similarity here. Can I ask you before you sit down, and if the presider, the Chief Judge, will permit me, to say something about the attorney's fees? Because the district court didn't say a whole lot about them. It's a tail, not the dog, but I'm concerned about the tail. Absolutely, Your Honor, and I'm glad you mentioned it. I mean, obviously, as Your Honor is well aware, it's abuse of discretion standard, and we don't see that there has been anything on this record to support an abuse of discretion, and that the fees awarded were entirely reasonable. As the court found here, prior to the commencement of this action, we sent chapter and verse, a letter to the plaintiff's counsel outlining the very law that dictated that there was no viable claim, and the analysis on a factual basis why there was no such claim. He ignored that. He went forward. He filed this action. He rejected 40 years of law in this case, in this court. Did the district court say any of what you're saying? Yes, the district court found that there was objective unreasonableness with regard to his reliance on law that wasn't the controlling law in the case, and the controlling law that she had found in this case, and she also found that there was real deterrence, that it wasn't just reliance on objective unreasonable, but there was a motivation to award fees here because of deterrence. That would be in accordance with Kurt saying. Exactly, Your Honor, and the deterrence here, the plaintiff faltered. He says, how could there be deterrence when she didn't address every one of my similarities, so how would someone know to deter? The deterrence here is evident. The deterrence here is that you should recognize that there is a fundamental distinction between expression and idea, and that what this case has rested on from the outset and throughout is that he is trying to, the plaintiff is trying to control and own ideas and not the expression of ideas, and that's an important deterrence here. It's an important one that publishers like Simon and Schuster face on a daily basis where they are hit with these over and over and over again of fundamentally flawed, often usually by people, and I believe this to be the case of the plaintiff here, who really believe in their case, who really believe that there has been a taking. I don't fault that, but the reality is that counsel or someone has to apprise these plaintiffs, and there needs to be a warning that there are penalties to be paid here, and one penalty is the risk of real fees, and so we would strongly urge the Court to affirm the awarding of the fees as well. Thank you very much. I appreciate it. May it please the Court, David Goldberg of Katmich and Rosamond on behalf of the film defendants. Your Honors, we all agree. Can I ask you a question at the outset? Please. Why was a separate motion to dismiss filed instead of simply joining the novel defendant's motion? It's an excellent question, Your Honor. There's two reasons. One, the film defendants are entitled to counsel of their choosing. The second is that we didn't know at the outset, and we don't know throughout the course of this litigation, whether there was going to be an assertion of a non-derivative similarity that would require separate briefing and argument, and the District Court properly found on both those grounds. We were being sued for seven figures, and we're entitled, we believe, under the case law and under to counsel of our choosing, our clients are. On the merits, briefly, we all agree at this point that if Ms. McNamara wins, we win. That there is no, at this point in the litigation, an allegation of non-derivative copy. So I will rely on what Ms. McNamara said for that proposition. I will note that the concept and feel of the movie is cinematic, obviously. It's broad in scope. It's about forgiveness. It's beautifully wrought. The characters are all very positive in their, you know, they wrestle with hard choices, and at the end, I don't want to give anything away, because I saw the movie myself, 2.2 hours, that I did not bill the client, and it was lovely. The, you know, as distinct from the screenplay, which is a much harder version of human nature. So there is, just at the broadest of expression, there is just vast differences. With respect to attorney's fees, the district court found that it was not a hard issue. And based on that, we believe that her decision awarding us very modest attorney's fees should be affirmed under the highly deferential abuse of discretion standard, as Ms. McNamara said. And with that, I'll rest. 15% discount, right? There was, and we don't, we didn't cross-appeal that. Before I get to the attorney's fees, I just want to respond to, sorry, briefly. Your decision in the Guido architecture case, Judge Kastman, among other things you've said, as the district court correctly observed, the various components and features that defendants allegedly misappropriated are generalized concepts and ideas that are common to countless other urban high-rise residential developments. So, an idea. No expression of an idea. That's what you said in the opinion. Ms. McNamara says, in narrative fiction, you have to use this test, the total concept and field test. You look at the dissimilarities. I won't waste the time repeating it, but please look at our reply brief, pages five through seven, and you will see that when Simon & Schuster, represented by the same law firm, in fact, the same as Young & Associates, who's an excellent lawyer, when they're the plaintiff, sometimes they win. When it's an published manuscript, not so much. But when they went to Judge Rakoff and they wanted to get partial summary judgment on liability, they didn't go into any total concept or field. They quoted Castle Rock, Ringgold. They said, you don't have to. It's just, was there a more than de minimis amount of taking a protected expression? And it doesn't have to be verbatim. And you look at the sequence of events, and you don't need any verbatim copying. And that's what Castle Rock says, by the way. You don't need direct quotations or close paraphrasing, any copying of protected expression. And as this court said, and I read part of this previously in the Williams v. Crichton case, yes, there are differences. We don't deny there are differences. Although what we said in misrepresented on page 9 of their brief, they say that on page 22 of the appendix in paragraph 24 of our complaint, we admit that the plot, the theme, the setting, all that stuff is different. We said the opposite. We said they were the same, except the plots diverge at the end. Please look at paragraph 24. It has been 180 degrees switched by them. We didn't admit that. Even the district judge said the themes are similar. And there are plot elements, obviously, that are quite similar. But here's what this court said in Williams. You get too soon to the reason, to the attorney's fees issue that you want to argue. Yes. There is an error, whether you call it an error of law, and under the Baker case, this court's decision in Baker v. Health Management, that can be reviewed de novo if it's an error of vendor. You can reverse if the conclusions are based on an erroneous determination of law, if the district court applied the wrong legal standard or made clearly erroneous assessment of the evidence. Well, it's clearly erroneous assessment of the evidence because the district court just blatantly disregarded almost all of the similarities. But let's talk about the law. Let's talk about how the judge didn't follow Kurtzsang. Kurtzsang reversed this court because the Supreme Court felt that this court was placing too much weight on objective reasonableness. In that case, reasonableness, but it could be unreasonableness. They said, no, you have to look at the other factors. There are four factors, and they're non-exclusive. There could be other factors. This judge only looked at one factor. She looked at, she decided, and I disagree vehemently, that's why we're appealing, that this was objectively unreasonable. And therefore, automatically, we have to deter other people from doing, bringing similar claims. Now, as I said, how would anyone know they had a similar claim to my client since you can read the opinion and the opinion in granting legal fees and you will, 95% of the similarities are not mentioned. So that's first of all. Second of all, we raised, there were other issues that were raised that she just decided to disregard. One was the film defendants claimed that we were trying to bully them and that that showed improper motivation on our part because we asked for $6 million in damages in 2016 to the defendants in closing the screenplay and asking for a discussion and asking for an accounting of how much they had made on the book and the movie, failing which, if they didn't want to do that, we would take $6 million. This was the number one bestseller in the New York Times bestseller list for years, which my client didn't know until the trailer came out for the movie. I did that in good faith. I let them stall for three months. Only after my phone calls do we get this letter. Now we lost those damages because under the Petrella case, you know, the Robert De Niro movie about raging bull case, it said no more latches for copyright infringement, but you can go back three years under the statute, but you can't go back more than three years. Now this book came out in 2012. I wrote the letter in November 2016. So the clock was ticking. We lost three months of damages because I was hopeful that we could have a dialogue. We got a letter instead, which is very similar. And all of this goes to the argument that you weren't a bully. I'm going to link this back to your challenge to the district court award. Sorry, we weren't improperly motivated, which is one of the four, Kurt saying, and fogarty factors. Also many of the cases when they find improper motivation, they look for a copyright troll. My client has never sued anyone for copyright infringement or anything else. If he had, they would have told the district court about it. So the district judge in a footnote said, well, I don't have to look at that. Well, she did have to look at it. It was a factor. It was briefed and it cut in our favor. Then I also raised another thing with the district judge. It's not just the need for deterrence, it's the need for deterrence or compensation consistent with the policy of the Copyright Act. And I cited a case, it's in a footnote towards the end of the reply brief in this case, that I think it's a decision by Judge Sweet that, you know, where there's such a great disparity of wealth, where the plaintiff is somebody that the district judge referred to as an aspiring screenwriter. And the defendant is institutional entity that spends its life being sued for the end, litigating these kinds of issues, has the money, the resources. And may I interrupt and say something that's both impudent and irrelevant. And that is, I see that Simon & Schuster is the publisher of the new Woodward book. Fair. Yes. So I think they'll be able to pay her. I think so. And I've already tried to buy it on Kindle. I'm re-looking at the district judge's footnote that you just alluded to. When I initially read that and the judge says at the conclusion after stating both parties' arguments, the court need not and does not hear a pine on plaintiff's motivation. I construed that as something that operated in your favor, that the judge was not assuming that you acted with bad motive. Are you urging us to conclude the contrary? I think so. I mean, I don't know. I'm not a mind reader. But she had already found against us because she found objective unreasonableness. And she thought that meant- But in the text stating her reasons, and then she says the book defendants have not argued the plaintiff was improperly motive. It's the film defendants who argue the settlement. Plaintiff points out the delayed timeline. The court need not and does not hear a pine. So I I'm trying to find out what you think is the error shown by that footnote. Well, she conflated, the main thing is she conflated deterrence with objective unreasonableness. Turned two factors into one. But are you arguing that there's something in the footnote that manifests error? I can see how you're reading it, Judge Radji. I read it the other way. I read it, here's something helpful to the plaintiff, and I'm going to just disregard it. Because it was helpful to the plaintiff. DreamWorks says we're bullying them by making a settlement offer. And I'm trying to show, no, we waited. We lost damages. My client isn't somebody who goes, okay. But you could read it your way, too. I agree with that. And then- The last- You're way over time, so could you just wrap up? Yes. The last thing is that this decision will not be a deterrent to anyone. And they didn't argue, we argued that, and they didn't respond to that point, either of them, in our main brief. How would you know this, you have a case, similar to a case, that has not been accurately described? Thank you. But please, I'm hoping you won't have to get to this. Thank you. I'm hoping they won't be the prevailing party anymore. I think we understand. Thank you. We understand the drift of your argument. Thank you all for your arguments, and the court will reserve decision. The clerk will adjourn court.